The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to give their attention where the Court is now sitting. God save the United States and this Honorable Court. All right. Mr. Matthew, you may proceed. Good morning. Good morning, Your Honors. May it please the Court, Nathan Matthews for Petitioners. The Forest Service and BLM have again permitted Mountain Valley Pipeline to construct a gigantic pipeline across steep, erodible slopes and streams in Jefferson National Forest. There are many flaws in the agency's approvals, but the central issues are still sediment and erosion. I'd like to begin with the agency's failure to address the consequences of their own predictions. In 2018, when the agencies had predicted that sediment in some streams would increase by 10% over baseline, this Court held that the agencies arbitrarily failed to address the impact of the predicted increase. The agencies repeated this error here. The new hydrologic analysis, despite its flaws, predicts even more sediment, increases of 10%, 20%, or more than 30% in many streams, twice the sediment predicted in the prior analysis. The agencies had specific substantive obligations to address the consequences of these increases, but again failed to do so. First, BLM had a Mineral Leasing Act obligation to, quote, ensure that activities in connection with the right-of-way or permit will not violate applicable water quality standards, and to avoid such violations. Nowhere in the record has BLM addressed these statutory provisions. BLM's silence regarding these obligations is itself fatal to BLM's approval here, just as in 2018, BLM's silence regarding co-location of the Mineral Leasing Act undermined BLM's prior approval. And, as I'll explain in a minute, BLM did not even explicitly consider this issue. But first, I'd like to address respondents' post hoc arguments about Virginia's Clean Water Act and the 401 certificate. The 401 certificate did not relieve BLM of its independent statutory obligation, and is not legally controlling. This points to Clean Water Act Section 511, but Section 511 is specific to NEPA. When Congress enacted Section 511, Congress knew that agencies addressed water quality under other statutes as well. But not only did Congress choose not to curtail those other authorities in Section 511, Congress explicitly preserved them in Clean Water Act Section 401b, enacting a broad savings clause which provides that nothing in Section 401, quote, shall be construed to limit the authority of any department or agency pursuant to any other provision of law to require compliance with applicable water quality requirements. So, contrary to the agency's brief, no authority even suggests that the 401 certificate is conclusive with regard to the agency's substantive obligations. And Congress has, in fact, explicitly said otherwise. And here, BLM needs the 401 certificate to be conclusive or to somehow strip BLM of authority because BLM didn't address it in the record. This is not a case where BLM said it was deferring to another agency's judgment because BLM just said nothing at all. In any event, the 401 certificate isn't even persuasive here and deferring to it would have been unreasonable because it considered very different facts. Virginia issued its 401 certificate on the basis of FERC's 2017 EIS and other contemporaneous data. So, Virginia could not and did not consider the evidence before BLM now. That includes the amount of sediment. BLM predicts twice what the 2017 EIS predicted. It includes the duration of impacts. In 2017, Virginia expected, based on the old EIS, that impacts... Are you essentially asking us to rescind the Virginia water quality certification issued in 2017? I am not. I'm just asking BLM to meet its own independent and parallel statutory obligation, which is specific to federal land. But I am not asking this court to pass any judgment about the continuing validity of Virginia's 401 certificate. Okay, thank you. Well, let me ask, how does that requirement interact with the fact that this right-of-way grant requires Mountain Valley to acquire new water quality permissions before crossing each river? There is... Mountain Valley pipeline is currently seeking new Clean Water Act authorizations for water body crossings outside the National Forest. But I don't believe that the current proceedings apply to the four crossings within the National Forest. The Forest Service has already approved in this... And BLM have approved in this proceeding, switching to boring under the water crossings in the National Forest. We separately argue that that approval was inappropriate. But because boring under streams has already been approved in the National Forest, I don't believe that there is any ongoing proceeding, other than what we have in this case, about the water body crossings in the National Forest. So, your answer is that it doesn't require... I don't expect Virginia DEQ to have any, you know, a further formal opportunity to weigh in here. I don't think that there is a new permit proceeding for the water body crossings. And so, I don't believe that there's a trigger for any ongoing new certificate from Virginia. So, you... Part of your argument here deals with this need, essentially saying there's a pre-decision or review that was required because, in effect, this undersecretary wasn't the one to make the proposal, that the proposal actually came from the Mountain Valley Pipeline. It seems to me, you know, the undersecretary did it, unless you're saying there's something nefarious or that they usurped something. I know there's allegations, at least statements to the effect, that really wasn't involved in it, and that in actually what happens, it almost sounds like ultra-virus-type things in a corporate law. But what is the... Tell me again your basis for saying that. Certainly, Your Honor. So, 36 CFR Section 218.13, the regulation that the Forest Service relies on here, provides a narrow exception to the pre-decisional review process for projects that are proposed by... That originate with the Secretary of Agriculture or the undersecretary. And the Forest Service could have promulgated a regulation that said, you don't need pre-decisional review for projects that are approved by the undersecretary, but that's not what they did. They... The text of the regulation says proposed, and we're asking the court to enforce the plain text of that regulation. Because it cabins how often this regulation is going to be applied. So, when would this pre-decisional review been done? And I understand, if I understand it correctly, you're talking about basically an interagency sort of review, or at least comments or something of that sort. When would that been done? Well, rather than just publishing a final record of decision after they had issued the final supplemental environmental impact statement, the Forest Service would have published a draft record of decision, which would have gone out for objections. That's what the Forest Service did in 2017, is they put out a draft record of decision concurrent with the final environmental impact statement. We would have... Likely many people would have submitted objections is what they're called to that, and the Forest Service would have had to resolve those objections. So, when would that have happened? In January of 2021. I expect that the Forest Service would have issued the draft record of decision on the same day that they issued the final record of decision, or instead of the final record of decision. So, that like... But wouldn't that just give cause for a delay? I mean, you did it in 2017, and if you want to expedite it or move it along, what would keep them from asking the undersecretary to do it? I'm assuming they asked, or was it the secretary, the undersecretary who asked to do it? Explain that process a little bit. The record indicates that it was Mountain Valley Pipeline who suggested designating this all as an action proposed by the undersecretary in order to skip the pre-decisional review process. We see that at JA-1663. But, I mean, I don't... If you're asking what the purpose of the pre-decisional review process is, it would have been that we could have presented our objections to the agency and possibly resolved them without having to come to this court again. It would have provided another chance for us to point out the errors to the agency, and hopefully some of these mistakes could have been fixed without having to come to court. So, it seems like your... Is your main argument here, at least in terms of the other questions you bring, particularly in terms of the sedimentation analysis and impact errors, is that when you're looking at disclosure of individual mitigation effectiveness, that they don't account for that 15%? Is that right? So, we have two broad buckets of arguments about sediment. The first is that even if you credit the hydrologic analysis and think that everything they say is credible, they still don't explain the consequences of that sediment. If sediment increases by the amount that they say they expect it to, we don't know what the consequences of that are going to be. Part of that is we don't know whether the resulting sediment will violate Virginia's water quality standards. We also don't know whether the resulting sediment will comport with the Forest Service's obligation to maintain and restore water quality and aquatic habitat. So, we do have a bunch of claims that even if the court were to credit the hydrologic analysis, et cetera, we still think that the agencies didn't take the hard look at sediment and didn't meet their substantive obligations. But we also think that the hydrologic analysis was not justified, and part of that is that we don't believe that it's explained by the evidence they actually cite. We also think that the hydrologic analysis needs to be reconciled with the real-world data that shows that, for example, the United States Geological Survey monitoring data that shows that in the real world, it looks like actual sediment from MVP's construction was 10 times what the current prediction of it would have been. And we think that the agency's complete failure to even acknowledge that information rendered their decision arbitrary and capricious. So, there's a use of a model here, and you seem to have a problem with using that model to come up with numbers like the 15 percent and other things. What's the problem with this model? Because I understand the model, and you've got to help me out here now. This is your area, not mine, but this model takes in considerations of, I guess, things like baseline and maybe other factors that come into play, which are the natural factors that are outside of that. So, what is the problem with the model? And isn't it done by an expert in terms of how they come up with these numbers? So, we don't have a problem with modeling per se, but the agencies have an obligation to address whether or not this model's predictions are accurate. And we don't know whether that's a problem with the model, a problem with the way that they use the model here, or something else. But if the model makes predictions that simply do not match what we see in the real world, the agency needs to explain that, and maybe the answer is to either use a different model or to tweak the way they're applying this model, or to do something other than modeling. But in the first instance, our concern is that the agency didn't even acknowledge contrary evidence in the record that seems to say this model here, the way they've done it so far, isn't working. So, is it your contention they just relied too much on the model or exclusively on it and should have used additional things? Because it seems like you're saying the model's okay, but you need something else? We, I mean, I personally have some doubts as to whether the model, but that's not the standard, is whether I have doubts. No, it's not. The legal claim is that they needed to consider all available information, and the Forest Service in particular has a regulatory obligation, 36 CFR 219.3, to explain that what it's using is the best available scientific information. And here, you know, we contend that the data from federal monitors that were installed in order to look at the impacts of this pipeline sure seems like real-world evidence of actual impact, and that evidence of actual impact is plausibly the best available information better than just a prediction based on a model. We aren't saying you necessarily need to base all of your analysis on the USGS data, but the agencies at least needed to consider it and explain why the model was reasonable despite this conflict between the model predictions and the real-world data. So you've got just a little time, and I'll tell you, when you look at this, there's no way in the world you could sit and argue every argument that you made in those briefs at the time, but you couldn't do it. It would take half the day, I believe that, to even get there. So why don't you give us a bullet list of those points, you know, if you're dealing with alternative crossing, afraid to comply with the 2012 rule or whatever that you consider. You've just got about a few seconds, but I don't know how we even cover this. It's hard to argue a case like this. I agree, Your Honor, and I appreciate the sympathy on that. You know, I just, on the water quality standards point, I want to emphasize that, you know, when Virginia issued the 401 certificate, Virginia thought that the water quality impacts were going to last days or weeks. Here, BLM has a new biological opinion based on the new hydrologic analysis that says impacts on sediment or sediment on streams will last up to four years. That's at JA-265. So it's drastically different facts than what BLM, the Forest Service, or Virginia Department of Environmental Quality considered back in 2017. You know, on the hydrologic analysis, we are troubled by the agency's refusal to say anything at all about the USGS data. But even the information that they do cite doesn't support their position. And one of the issues this Court remanded on in 2018 was the failure to consider or address the fact that mitigation measures don't work perfectly in practice. We have a demonstrative history of mitigation measures failing here, and the question of imperfect implementation or failing mitigation is not addressed by the model. So all the arguments about the model is good and the model is accepted have no bearing on the way they treat imperfect implementation. For perpendicular profiles, where the pipeline is going up and down the slope, the hydrologic analysis makes no adjustment at all for imperfect implementation, even though the record shows that mitigation measures used there, water bars and sediment traps, often fail. I see that I'm out of time. All right. Thank you, Mr. Matthews. Mr. Tote? Mr. Chief Judge, and may it please the Court, Brian Tote from the Department of Justice, representing the Federal Respondents, principally the Forest Service, and the Juror of Land Management, or BLM. I'm sharing time with counsel for Intervenor Mountain Valley Pipeline, Mr. Don Morelli. Since this Court last heard these agencies before the Court on this project three years ago, the agencies have taken the Court's remand order seriously. The Court identified three issues on which it remanded and found flaws in the prior analysis. The agencies, in response, prepared a detailed Supplemental Environmental Impact Statement, or SEIS. BLM prepared a detailed practicality analysis under the Mineral Leasing Act. Why did you, why was the decision made to skip over the pre-decisional review in, I guess, late last year, in January of this year, and go straight to the Undersecretary, who, at least for the record, I think there's some indication the Undersecretary was involved, and I'm not sure he has to be, but it seems like he wasn't involved at all, too much. And yet, went there and skipped over this pre-decisional review, which was undertaken, I guess, to some degree in 2017. Why was that done? Or was that something you think would be of any import to us? The decision was made, actually, at the time the draft Environmental, Supplemental Environmental Impact Statement was released to the public in September of 2020, not in January. And there was an opportunity for the public to comment on the Undersecretary being the official decision-maker. When you say not in January, I was referring to January 2021, when the Undersecretary actually signed it. Correct. I wasn't talking about 2020. No, so his involvement, you know, there's documented involvement from the point of the draft Supplement EIS. And that went out for public comment. In fact, the petitioners commented on that issue, and you see that in the record. So, they had an opportunity to weigh in on that, and the Forest Service responded in the record of decision and in the response to comments as to why it believes that it was proper for the Undersecretary to be delegated the authority and to make the decision without the pre-decisional objection process. So, the contention is that it really wasn't his proposal. It was a proposal of Mountain Valley Pipeline. But your contention is, I guess because of the review decision here, it indicates that it was the Undersecretary who actually proposed it. Yes, and I think you have to understand the nature of the proposal. I think I differ with my friend on the other side about that. They say that it's the privately conceived project that's the proposal. In actuality, the proposal was driven by Mountain Valley's application for a right-of-way from BLM. BLM, in turn, needed the concurrence of the Forest Service, which then needed to amend its Forest Plan. So, this was a request, essentially, from the Forest Service to the public to have comments on the proposed amendment of the Forest Plan. That was an agency-driven proposal. It's true it was generated originally by the application by Mountain Valley, but approximately the need to amend the Forest Plan came from the fact that the Forest Service had to concur or was asked to concur in the right-of-way issuance. So, I think that's supported by the text of the overall regulation. If you look at the second sentence of the regulation that we're discussing, 218.13b, it makes the undersecretary's decision final for the agency. I submit that that would not be possible under petitioner's reading. In addition, there's just a common-sense notion that the undersecretary, being a sub-Cabinet official, the highest, below the secretary who supervises or administers the National Forest, that he ought to have final decision-making authority, especially with the regulation. So, when you get to the issues that your opposing counsel has presented here, it focused initially on the sedimentation analysis and impact errors. And to some extent, this whole business of the 15 percent, which comes from this measure of mitigation, effective measures, the question is whether what was used to compare that model, did it measure up to the effectiveness of what actually happened on the slopes of 15 percent? You've got Jefferson National that has 15 percent, but the model probably doesn't take all that in. How does that factor in here? So, any model is going to have limitations. And the important thing under NEPA is that the agency acknowledges the limitations of the model, which it did, and then responds to additional concerns beyond that. So, the agency relied on a thorough process of vetting the model and ensuring the integrity of the model, first of all, but it didn't rely on the model alone. It also relied on the fact that there were enhanced erosion control protections, in other words, best management practices over and above what the model had considered, and that it was requiring those in response to having reviewed this history of violations that my friend from the petitioners is referencing. Well, Mr. Toth, you also maintain that it is, quote, unsound to force the sedimentation model into a real-world data point. How is the model an effective measure of what will happen in the forest, then, if it's not considering the real-world data points? So, the model considered other real-world data points taken from many, many years of data. It's a model that was developed by the USDA itself, the Agricultural Research Service, a liaison to the model's development. Many years of data in the Jefferson National Forest? No, no, elsewhere. But the point is that the model has enough data from other areas that it has been proven in the state of the industry and the state of soil conservation science to be statistically robust for its intended use. So, it does have limitations. One of them is the steep slopes. That is why the agency didn't rely solely on the model. It looked outside the four corners of the model to examine the history of violations that my friend is talking about, and you see this in the response to comments. I may have some page sets for you in a minute, but you have to look at, not only is there enhanced erosion control protections that are imposed on top of the modeling, but also there is ongoing monitoring by a third party. You'll see this referenced in the record as the TransCon monitors. They were out there daily giving daily reports during active construction, and since the project has been essentially put to bed for a little bit, there have been weekly reports as well on the stability of the slopes during this interim period. So, you say it acknowledged these limitations of the model. How did it acknowledge those limitations? Well, first of all, by reporting the results of the modeling and fully disclosing the model and vetting the model through essentially an interagency task force of six federal agencies, including someone from the Natural Resources Conservation Service, formerly known as the Soil Conservation Service, that looked at the use of the model and determined it was properly used within its limitations. Those deliberations are throughout the record. I would point the court to the response to comments at 865 to 866 of the Joint Appendix. There are a number of other record sites of the deliberations that went on. I'll give you a couple. All six agencies participated in a conference call. It's summarized at 1666 to 1674 of the Joint Appendix. But over and above this, acknowledging the limitations of the model and that it was fully applied as intended, the agencies looked at this. What about the contrary data from the USGS monitoring data? What about that? Did it account for that? So, a couple points on that. First, we have a little bit of tension in the record about specifically whether that data was considered, but there is a statement on page 579 of the Joint Appendix. It's in the EIS. It says, all scientific information submitted to the agency during the public comment period was considered in the development of the FSEIS. So I think given the presumption of administrative regularity, you have to take that statement at face value and assume that the data was submitted, it was considered by the agency. There are some issues specifically on the nuts and bolts of the data, whether it talks in terms of turbidity, which is cloudiness of the water, how that relates to sedimentation or where the dirt actually ends up is complicated. That is not a, you know, petitioners didn't make that connection. The burden was on them to do so. The gauge stations that measured these USGS stream measurements are located at some distance from the project site. So there's an issue about what was the weather that was occurring? Was this a storm event? How did this turbidity relate to where the sediment eventually ended up? It's a complicated process. And the best I can say is that for, you know, the many little things like that, you know, a thousand cuts I would say that my friend races against this project, the agency couldn't tackle them all head on. Let me raise another one. What are the impacts of the conventional bore method for the stream crossings here, which I understand is different than what it was originally planned to be? So it's expected that the stream, the under boring, conventional boring will reduce the aquatic impacts and the effects of the stream. I noticed you say it's expected there. The final consideration of what the actual impacts would be on the conventional bore method hasn't been completed yet, has it? The NEPA analysis for the crossings on the national forest, there are four stream crossings on the national forest, two that are nearby. So a total of six that were analyzed by the supplemental EIS here, which is what we're concerned about. Those were discussed in the supplemental EIS. Contrary to my friend's argument in the brief, there is more to it in the EIS. There's a number of citations for where conventional boring was analyzed. Is there more left to be done on the conventional boring analysis by FERC or the Army Corps of Engineers? It appears there is. I'm not representing those agencies. I don't represent FERC at all. Why shouldn't we wait or at least the agency wait until those reviews are done to actually know what the impacts of this new boring method for crossing streams in the forest would be? Because those agencies' analysis is going to be more expansive. It's going to relate to nearly a thousand stream crossings that are not on the national forest. How many is it going to relate to that are on the national forest? I don't know because I haven't seen that EIS. My friend just represented in his opening argument that those stream crossings on the forest are not at issue in these other proceedings before the Corps. The supplemental EIS here focused on the stream crossings within the national forest. There are only four plus two nearby, six at most. Keeping this in perspective, there are a thousand stream crossings that we're talking about in those other proceedings. The conventional boring on those six stream crossings was discussed in the supplemental EIS. It's at 619, 676, 686-87, 712, 724-25, 752, 874. These sites are all in our brief. There are sites for the joint appendix, portions of the supplemental EIS where conventional boring was discussed. If I may, I'd like to address briefly the water quality certificate issue. This is somewhat clever of my friend. He originally raises this claim under NEPA, which is a procedural statute, but then when faced with the statute under the Clean Water Act, it says NEPA doesn't permit the agencies to second guess the water quality certificate. He resorts to these regulations that he calls substantive that apply to BLM. I'd urge the court to look at the text of the regulations. It stems from the obligation of the Mineral Leasing Act to the secretary to issue regulations or impose stipulations that shall include requirements to ensure that activities in the right-of-way meet water quality standards. There are stipulations to the right-of-way grant. Page 109 of the joint appendix, it's stipulation 38, says the holder must obtain all Clean Water Act Section 401's water quality certifications or waivers required for the project prior to construction on the National Forest. That's for the whole project. One more citation, JA 102, there's another condition that fulfills that statutory requirement to include the appropriate stipulations. See, I'm out of time, but I'm happy to answer any further questions the court might have. Thank you, Mr. Toth. Mr. Verrilli, you have time. Good morning, and may it please the court, I'm Don Verrilli for Intervenor Mountain Valley Pipeline. I'd like to make a point about the Forest Plan Amendment issue, the Sedimentation Issue and Conventional Floor Issue, and if I have time, the Pre-Decisional Review Issue. But I'd like, if I could, to start with a broader point, a contextual point, which is that I think it's important to understand that we're talking here about a national forest, not a national park, not supposed to be kept entirely for pristine use in the way a national park is. In fact, there are multiple uses, and the Forest Service not only authorized to allow for multiple uses, but is required by the applicable statute to do so. And I'm looking here at 16 U.S.C. 1604E, which says, The Secretary shall assure that Forest Service plans provide for multiple use and sustained yield of products and services obtained therefrom. And I think that's critical, because what it tells us is that there are going to be actions that occur in the forest that are going to change the ecosystem. And the question is whether the agencies involved have taken a hard look at those actions and made a reasonable response, and they have here. And with respect to the, turning first to the Forest Plan Amendment issue, I think this goes directly to Fishner's argument that the agencies didn't consider the effects of what they claim is an increase in sedimentation. I think they're wrong about those numbers, but whether they're right or wrong about it, the point is that pages 751 to 755 of the JA is where the Forest Plan Amendment issues, they look with respect to soil erosion, all the different effects, based on the information in the record generated about the level of soil erosion, they've come to the conclusion those effects are not inconsistent with the requirements of the Forest Service plan. So A, they obviously considered it. B, they made a reasoned judgment about it. That's all the law requires. By the way, with respect to this issue, those same pages clear up this argument, I think, that my friends on the other side make, that the Forest Service applied the wrong standard, applied a substantial lessening standard instead of the regulatory maintain or restore standard. Every single one of those pages, with respect to every single one of the requirements of the Forest Service plan, we'll see the agency applies presently maintain or restore standard and then decides if the standard is met. With respect to, maybe you could just try to clear up the conventional board as you quickly, and then go to sedimentation. With respect to conventional board, there was a thorough analysis by the agencies here of the effects of conventional board with respect to these... So has FERC given final approval for the use of the conventional boring method here? And if so, where can I find that in the JA? No, they haven't yet, Your Honor, but the question I think... Did you say they have not yet? They have not yet, but the question I think, I think the relevant place to look in the JA, if I could, is page 712 of the JA, which contains a very thorough analysis of the effects of conventional board. We've quoted it at page 35 to 36 of our brief. There's a thorough analysis here that more than satisfies the applicable standard of review... Well, I'm looking at JA 1201, where the FERC commissioner gave partial approval and said, while I approve the request to modify the proposed crossing method for these six streams, I do not authorize construction at this time. Construction remains contingent on other outstanding federal authorizations. Right, but respectfully, Your Honor, I believe the question before this court is whether the Supplemental Environmental Impact Statement was arbitrary and capricious for failure to consider the effects of conventional bore, and the answer to that is no. They were expressly considered as a lengthy paragraph... Well, I guess my question is, it says construction remains contingent on other outstanding federal authorizations. That's what the FERC commissioner said. Have all those federal authorizations been received? You just told me that the FERC has not given final approval to use the conventional boring method. No, they haven't all been received, but the key point, I think, Your Honor, is whether this... Well, then how is that not arbitrary and capricious to just haul off and start construction when the FERC commissioner says that that is not yet approved? This doesn't allow them to haul off and start construction. The only issue before the court is whether this Supplemental Environmental Impact Statement is arbitrary and capricious for failure to consider the issue, and it did consider the issue. It can't start construction until FERC gives them the green light. That's a different question from the question of whether this SEIS is arbitrary and capricious. That's completely answered by the material on page 712. 712? 712. It's completely answered... Okay, thank you. It's a completely discussion of effect. If I could... I'll look at that. ...turn to sedimentation, if I could. I think the key issue here is that, with respect... I'm going to go right to this UFPS data and why it isn't a basis for finding the agency activity. First, page 975 of the Joint Appendix, the agency does explain why it's not going to look to specific isolated data points. The integrity of the models outputs in the question, well explained there. And this is just one data point, and they've explained why they are not giving you a considerable weight. And, you know, that makes perfect sense if one thinks about it, because, you know, for several reasons. First, it's an apples-to-oranges comparison. What the model does is evaluate expected annual levels of erosion. Purpidity would take 15-minute snapshots of what the water looks like in particular. A. B. There is nothing in the record. Nothing in the record shows a causal connection between... ...purpidity levels. It's complete speculation. They haven't cited anything. They cite 11... ...find they say nothing demonstrating a causal link between... ...purpidity, and that shows you why. Does it make sense? Look at these kind of isolated data points and use them to call the model into question. And then another key point here, I think, that the... I think one can see this. It's quoted at page 30 of our brief. But the key point is that the agencies didn't rely just on the model. They did look at historical experience. They explained that they looked at historical experience, and the key page there is page 64 of the Joint Assemblies. They specifically say, you know, it's not just the model, that there is a robust system of monitoring, inspection, and remediation in place, and we have looked at the historical performance of that, which has led to financial improvement. We can rely on that system so that if, to the extent the model fails, accounts for imperfect implementation of mitigation measures, they will be dealt with by this other approach. It's...the agency took a hard look at it, specifically considered it, weighing its results. So I see I'm over my time. If I am able to make one point of pre-decisional review, I would appreciate it. You may. Thank you. In addition to the point that my friend from the United States made about the nature of whose proposal it is, I would ask the Court just to look at 36 CFR 218.1, which is the provision that sets forth the whole possibility of pre-decisional review. And it says pre-decisional review is available for proposed actions of the Forest Service. Their whole argument is that this proposed action isn't an action of the Forest Service because it isn't a proposal of the Forest Service because it was a proposal by MVP. But if they're right about that, then the whole regime of pre-decisional review doesn't apply at all. It demonstrates why they can't be right about that and why the Court of the United States made about why this is actually a proposal of the Forest Service is correct. Thank you. Thank you, Mr. Verrilli. Mr. Matthews, your reserves and time. Thank you, Your Honor. First, on the water quality standards, we consistently cited BLM's substantive obligations under Mineral Leasing Act 185 subsections H and J to ensure compliance with water quality standards. We did not hide that until the end. We cited it in our comments to the agency at JA 1027. We cited it in our opening brief at page 45. On the USGS data, counsel for the government suggests that maybe the USGS data isn't applicable here because it requires equating turbidity and sediment. That's post hoc and it illustrates why post hoc arguments shouldn't be allowed. The method we used to correlate turbidity and sediment is supported by published peer-reviewed literature and it underlies a good chunk of the biological opinion. It's what Fish and Wildlife Service did here. So the major challenge we have here on review is we abound by the record. And so when we hear argument of counsel pointing to various pages, you and your opposing counsel, the challenge to us is you may, that record may actually say that, but the question is, is the data there and is the analysis there? And that's a challenge for us when we're looking at this and trying to determine the words can be used, but then the question is, you take, for example, in 712, you talk about the conventional bore of a paragraph, in a paragraph, and it does talk about impacts. The question and why these cases are difficult is because they really get into the nitty gritty, so to speak. We all know the proper words and the way in which to capture it. The question is, is the data and analysis there in turn that supports this? And even when you talk about the criticisms of this data from USGS, the question comes up is, well, where are those criticisms in the record? Because argument is not going to suffice to be record alone. You've got to have something to go with it. But those points have been articulated. Are there instances that you would think that there may be, at least to answer what you're saying, that boilerplate language is there, but what you may be pointing to is that the analysis or the data is not there. That's exactly my point, Your Honor, and hopefully I can save you from work about wading into those details, because there is nothing there in the record here. The question isn't whether the agency... I don't think you can save us from the work wading into the details, because as I said, you don't have enough time to do that. But we've got to do that, but to be able to point specifically, that was why I was pointing to the bullets of it. You probably should spend, as you heard Mr. Varela point, to direct points in the record. That's important to us, because this is a record-specific case, and to be able to deal with it, we need to hear where in the record. I mean, we can talk about the policy and all the good stuff that can happen and why it's done, but when we leave out of this, what we're going to do is go to the record and then really dive into what's going on here. So that's helpful to us. So I can't point you to where in the record the agency discussed the USGS data, because they didn't discuss it. There is nothing in the record. If the agency had said, we aren't worried about this USGS data because we trust the model over the data for whatever reason, they could have said that in the record, and then we could have a conversation about whether those contentions were supported. But there is nothing in the record responding to this USGS data. Mr. Varela pointed to, I believe it was page 712, Mr. Varela pointed to the manual for the model, which isn't any discussion of any technical expert here about the data in this case. And the manual says don't overfit to specific sites, but the manual also says, don't just rely on the model, also consider on-the-ground data, as does Forest Service guidance that we cite in our brief. And the agency experts in the record here asked for on-the-ground data. So there's nothing in the record I can point to about the agency discussing the USGS data because they didn't discuss it, and that's our claim. On slopes, I just want to note that, although the model didn't include any explanations as to why its predictions were valid for slopes over 15%, in the National Forest, more than half the slopes are over 30%. So it's a big gap. And then on the on the pre-decisional review, the 218.1 applies to actions of the Forest Service, and it's clear that it's an action of the Forest Service here, but it was proposed by MVP. Both the pipeline, but also the amendments were proposed by MVP. They've been steering the ship the whole time. We cite a bunch of places in the record where the Forest Service acknowledges that MVP proposed the amendments, not just the pipeline, in our opening brief at page 27. I see that I'm out of time, but if there are further questions, as you mentioned, Judge Wynn, I could talk about this all day. Thank you, Mr. Matthews. Thank you all, counsel. We can't come down and greet you in our normal tradition of the Fourth Circuit, but know that nonetheless, we appreciate very much your being here and help on these very difficult and complex case. So I wish you well and stay safe. Thank you, counsel. Thank you.
judges: Roger L. Gregory, James Andrew Wynn, Stephanie D. Thacker